## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,                                    Case No. 19-cr-64 (MJD/ECW)

               Plaintiff,

      v.                                    **REPORT AND RECOMMENDATION**

Michael Antonio Miller,

               Defendant.

---

On March 5, 2019, Defendant Michael Antonio Miller ("Miller" or "Defendant") was charged on one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Dkt. 1.) This matter is before the Court on Defendant's Motion to Suppress Statements (Dkt. 97) and Defendant's Motion to Suppress Evidence Obtained Through Search and Seizure (Dkt. 101). The Court held a hearing on February 21, 2020. (Dkt. 109.) Amber Brennan and Samantha Bates, Assistant U.S. Attorneys, appeared on behalf of the United States of America ("the Government") and Miller represented himself at the hearing. Lousene Hoppe, Esq., appeared as stand-by counsel for Miller. This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

For the reasons stated below, the Court recommends that Defendant's Motion to Suppress Statements be denied except as to Miller's statements made between 3:00:50 and 3:01:01 in Government Exhibit 2 and Motion to Suppress Evidence Obtained Through Search and Seizure be denied.

# I.    FACTUAL BACKGROUND

## A.    February 5, 2019 Traffic Stop and Officer Maloney's Body Camera Footage

At the February 21, 2020 evidentiary hearing, Sergeant Michael F. Dunaski with the Saint Paul Police Department testified about a February 5, 2019 traffic stop of Miller. (Dkt. 113 at 24-28.)  Sergeant Dunaski also testified about his investigation of Miller in connection with a shooting that occurred in November 2018 at the Lamplighter Lounge in St. Paul, Minnesota.  (*Id.*)  Sergeant Dunaski testified that Miller was charged in connection with the Lamplighter Lounge incident.  (*Id.* at 28.)  Neither the firearm nor clothing from the shooting had been recovered prior to the February 5, 2019 traffic stop. (*Id.* at 26.)

On February 5, 2019, in an attempt to locate Miller, officers conducted surveillance at a St. Paul address belonging to Miller's girlfriend's brother.  (*Id.* at 28.) Officers had information that Miller's girlfriend ("KMJ") was living there.  (*Id.* at 28-29.) Surveillance observed Miller and KMJ arrive at that address.  (*Id.*)  Sergeant Dunaski testified that officers knew that an active Domestic Abuse No Contact Order ("DANCO" or "order for protection") was in place, which prohibited Miller and KMJ from having contact with each other.  (*Id.* at 29, 31.)

During the February 5, 2019 surveillance, officers observed Miller and KMJ exit that St. Paul residence together and drive away in a black SUV.  (*Id.* at 30.)  Sergeant Dunaski, who was in his car a few blocks away, verified that the DANCO was still in place and initiated the traffic stop to arrest Miller for violating the DANCO.  (*Id.* at 31.) Sergeant Dunaski knew that Miller had prior felony convictions, was charged with the

Lamplighter Lounge shooting, and was prohibited from possessing a firearm. (*Id.* at 32.) Sergeant Dunaski also knew that KMJ's driver's license had been revoked before he initiated the traffic stop. (Dkt. 133 at 46-47.) A marked squad car conducted the traffic stop, and Sergeant Dunaski arrived at the scene to assist. (*Id.*) KMJ was driving the SUV while Miller was riding as a passenger. (*Id.* at 34.)

Officer Sean Maloney, an officer assigned to the gang unit, was also at the scene of the traffic stop. (*Id.*) His body camera captured the incident. (*Id.* at 33; Gov't Ex. 1.) As Officer Maloney initially approached the SUV, Sergeant Dunaski was at the passenger door of the SUV handcuffing Miller. (Dkt. 113 at 33-34; Gov't Ex. 1 at 1:15-1:58.) Sergeant Dunaski asked why Miller and KMJ were together because there was an order for protection. (Gov't Ex. 1 at 1:45-1:51.) KMJ said that she did not ask for an order of protection. (*Id.* at 2:03-2:06.)

Before Sergeant Dunaski removed Miller from the SUV, an officer opened the back passenger door and looked inside of the SUV. (*Id.* at 1:41-1:54.) As Sergeant Dunaski removed Miller from the SUV, officers looked inside of the SUV through the open back passenger door. (*Id.* at 1:54-2:05, 2:20-2:23.) Once Miller was removed from the SUV, Officer Maloney stood at the open front passenger door and looked in the passenger area and through items within in the immediate reach of Miller with a flashlight, including un-crumpling and looking inside a snack-size chip bag, looking at the passenger floor area, looking into a white shopping bag, and looking into the space between the passenger seat and center console. (Dkt. 113 at 36; Gov't Ex. 1 at 2:23-3:35.) At no point did Miller or KMJ give officers consent to search the SUV, although

KMJ observed the search while sitting in the driver's seat and lifted her purse to allow Officer Maloney to pick up the white shopping bag. (Dkt. 113 at 41.)

Sergeant Dunaski eventually went back to the driver's side of the SUV to speak to KMJ about her license and insurance on the car. (Dkt. 113 at 37; Gov't Ex. 1 at 3:16-3:26.) Around that time, Miller was placed in the back of Officer Donald Chouinard's squad car. (Dkt. 113 at 35-36, 56.) Sergeant Dunaski testified that KMJ indicated that she had purchased the SUV, but it was not registered to her yet. (Dkt. 113 at 46.) While speaking to Sergeant Dunaski, KMJ briefly exited the SUV. (Gov't Ex. 1 at 3:30-3:39.) KMJ then re-entered the SUV, opened the center console, and exposed a handgun while searching through various papers within. (*Id.* at 3:40-3:46.) Standing outside of the open front passenger door, Officer Maloney observed the handgun and yelled "gun!" (*Id.* at 3:46-3:49.) KMJ responded, "I was going to show you!" (*Id.* at 3:48-3:53.) KMJ was also taken into custody. (*Id.* at 39.) Sergeant Dunaski testified that he did not have a warrant for the handgun at the time of the traffic stop. (Dkt. 133 at 44.)

## B.    Officer Chouinard's Squad Car Footage

At the February 21 hearing, Sergeant Timothy Moore of the St. Paul Police Department, who is assigned as a Task Force Officer to the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified about video footage taken in Officer Chouinard's squad car after Miller was arrested. (Dkt. 113 at 58; Gov't Ex. 2.) Sergeant Moore also interviewed Miller at the Jail. (Dkt. 113 at 49.)

While Miller was alone in the squad car, he made several statements as he watched the discovery of the handgun and KMJ being taken into custody: "Fuck. Damn,

my fingerprints are all over that bitch!" (Gov't Ex. 2. at 2:56:56-2:57:00) and "Bae, don't

say shit! Don't say shit! It ain't yours! Don't say shit! Bitch! Fuck them! Bitches!

Don't say shit. Fuck them. Let them do they job." (*id.* at 2:57:55-2:58:25). After Officer

Chouinard entered the squad car and started driving Miller to the Ramsey County Law

Enforcement Center ("the Jail"), Miller initiated a conversation with Officer Chouinard

about whether other officers planned to return money he thought they had taken from

Miller's pocket. (*Id.* at 2:59:08-2:59:11.) Officer Chouinard told Miller, "Well, I don't

know if they do or not" and later said "it's in your pocket, shut up." (*Id.* at 2:59:11-

2:59:15.) Officer Chouinard also told Miller that "I got a camera on" and "don't try to

lie." (*Id.* at 2:59:20-2:59:22.) Miller responded that he was not lying and Officer

Chouinard replied: "You're lying if you say we took it." (*Id.* at 2:59:22-2:59:32.)

A few second later, Miller said, "I thought he took it out of my pocket," and after

being told it was still in his pocket, said "OK." (*Id.* at 2:59:40 - 2:59:45.) Officer

Chouinard said, "We didn't take your money" and Miller responded, "All right." (*Id.* at

2:59:45-2:59:47.) After about 15 seconds of silence, Miller asked, "What put you all

onto that car, though?" and Officer Chouinard responded that Miller would have to talk

to another officer. (*Id.* at 3:00:02-3:00:20.) After about 25 seconds of additional silence,

Miller said, "You all need to let her go man . . . that's my gun." (*Id.* at 3:00:43-3:00:47.)

Officer Chouinard responded, "I'm sorry, what?" and Miller said again "You all need to

let her go. That's my gun." (*Id.* at 3:00:47-3:00:50.) Officer Chouinard responded, "She

said it was her gun, dude." (*Id.* at 3:00:50-3:00:55.) Miller insisted that the handgun was

his and that KMJ was his wife and she would say anything to protect him while Officer

Chouinard responded, "Okay, but she said it was hers." (*Id.* at 3:00:55-3:01:00.) Officer Chouinard told Miller yet again, "She said it was hers," and asked, "Whose DNA is going to be on it?" (*Id.* at 3:01:02-3:01:07.) Miller responded, "Mine," insisted the handgun was his, and told Officer Chouinard to tell the others to release KMJ. (*Id.* at 3:01:08-3:01:16.) Officer Chouinard asked, "Why'd she tell us it was hers?" and Miller responded against that it was because KMJ was his wife and wanted to protect him, and in response to Officer Chouinard's statement that, "she involved herself by telling us it was hers," responded, "Well, I'm telling you that it was mine." (*Id.* at 3:01:17-3:01:35.) After some additional silence, Miller stated that he had just bought the handgun, for self-defense purposes, and that he did not know what had happened with the handgun before he bought it. (*Id.* at 3:01:47-3:02:05.) He then said he needed to talk to somebody because he knew "everything about everything." (*Id.* at 3:01:06-3:01:10.) Officer Chouinard then questioned Miller about the DANCO, and Miller returned to the topic of talking to law enforcement anonymously to avoid doing jail time but then expressed concern about doing so. (*Id.* at 3:02:38-3:03:28.) Officer Chouinard replied "All right" and, after Miller stated that people were trying to kill him, Officer Chouinard asked, "Is that why you got the gun?" Miller responded, "I keep it—I have to because they going to blow me down." (*Id.* at 3:03:33-3:03:37.) He then said he was shot at recently on the East Side of St. Paul and said he could tell the police about it, including the people who were trying to kill him, and sought immunity and protection in exchange for telling the police "why I got my gun." (*Id.* at 3:03:37-3:05:20.) This exchange involved responses from Officer Chouinard such as "Yup" and "All right," but no questioning. (*See id.*)

C.    **Interview at Ramsey County Law Enforcement Center**

Sergeant Moore also testified about his interview of Miller that took place at the

Jail after the traffic stop.  (Dkt. 113 at 47-56, 63-65.)  The interview was audio recorded.

(Gov't Ex. 3.)[1]  Before the interview, Sergeant Moore removed Miller from a holding cell

and walked him across the hall where Sergeant Moore conducted the interview.  (Dkt.

113 at 51.)  Sergeant Moore was in plainclothes during the interview.  (*Id.*)  Sergeant

Moore testified that he never threatened Miller outside of the recording to get him to talk.

(*Id.* at 53.)

Before Miller was read his *Miranda* rights, Miller initiated a conversation with

Sergeant Moore about an unrelated criminal matter.[2]  (*Id.* at 54-55; Gov't Ex. 3.)  While

his handcuffs were being removed in the holding cell, Miller said he would not cause any

issues for Sergeant Moore, said he could be trusted, said he only has business with the

people trying to hurt him, and asked, "Can I tell you my [indistinguishable]," to which

Sergeant Moore responded "yeah."  (Gov't Ex. 3 at 0:44-1:02.)  Whispering, Miller then

told Sergeant Moore about being shot at the other day, asked if the police have any

information about an unrelated recent criminal matter, said he was already fighting a case

for someone who tried to kill him, and offered to provide information in exchange for

---

[1]    At the February 21 hearing, Sergeant Moore indicated that at some point during
the interview, his recorder got interrupted and did not get turned back on.  (Dkt. 133 at
54.)  However, a majority of the interview was captured.  (*Id.*)

[2]    There is no suggestion that discussion of the other criminal matter raised by Miller
involved Miller or would incriminate Miller, or was related to the criminal charges
pending in this action.

release and safety.  (*Id.* at 1:03-2:17.)  Sergeant Moore responded "OK," and when asked

if he "heard" Miller, Sergeant Moore responded in the affirmative.  (*See id.*)  Miller then

said to Sergeant Moore, "I can help you, if you can help me."  (Gov't Ex. 3 at 2:18-2:22.)

Miller then offered to provide Sergeant Moore with information in connection to the

unrelated criminal matter.  (*Id.* at 2:27-3:10.)  Miller also asked Sergeant Moore for

permission to speak to KMJ, but Sergeant Moore refused due to the DANCO.  (*Id.* at

3:35-3:44.)  Miller again indicated that he could get information for Sergeant Moore

related to the other matter.  (*Id.* at 4:20-4:48.)  Sergeant Moore responded to most of

Miller's pre-*Mirandized* statements with short, verbal responses like "ok" (*id.* at 1:40-

1:45), "uh-huh" (*id.* 2:20-2:23), "sure" (*id.* at 2:40-2:42), and "I get it" (*id.* at 3:25-3:28).

Sergeant Moore did ask Miller whether the information he had was first-hand information

("something that you saw with your eyes") or information obtained by word of mouth.

(*Id.* at 4:48-5:02.)

After Miller responded that his information was not first-hand, Sergeant Moore

said "Let me get to this real quick and then – I got to do this quick cause – while you're

down here – and then we'll talk, all right?  And here's the deal.  I can send somebody

down there – here – that can talk to you."  (*Id.* at 5:03-5:22.)  Miller said, "OK, what do I

got to do?  What are we doing now?"  (*Id.* at 5:23-5:27.)  Sergeant Moore responded, "I

just have to – have to read you *Miranda*, read you your rights, OK, and then I'm going to

ask you for a buccal sample."  (*Id.* at 5:27-5:34.)  Miller said, "Uh huh," and Sergeant

Moore asked, "Have you done that before?"  (*Id.* at 5:34-37.)  Miller responded, "Yeah, I

did," Sergeant Moore said, "OK.  And then I'm going to just – " and Miller then

8

interrupted with "Hey, I'm letting you know now, it's going to come in with my DNA on it. I just bought that motherfucker. But it's going to come back with my DNA on it. [Indistinguishable.] You feel me?" (*Id.* at 5:37-5:50.) Sergeant Moore said, "OK, yeah I hear you." (*Id.* at 5:50-5:51.)

Miller again insisted on discussing information from the unrelated criminal matter and asking to see KMJ. (Dkt. 113 at 55; Gov't Ex. 3 at 5:50-6:24.) Sergeant Moore again explained that they could not let him see KMJ due to the DANCO (Gov't Ex. 3 at 6:30-6:35), and then began asking Miller for his name, contact information, and educational background in connection with a *Miranda* form while Miller interjected with offers of information about the other criminal matter (*id.* at 6:36-8:16). About eight minutes into the audio recording, Sergeant Moore read Miller his *Miranda* rights for the first time. (*Id.* at 8:17-8:55; Dkt. 133 at 65.) Miller orally confirmed his understanding of his rights and initialed and signed the *Miranda* form. (Gov't Ex. 3 at 8:17-9:03; Dkt. 133 at 52-53; Gov't Ex. 4.) Shortly thereafter, Miller confessed to placing the recovered handgun in KMJ's SUV immediately before he and KMJ were pulled over, to buying the gun, and to knowing that he was not permitted to possess guns because he was a felon. (Gov't Ex. 3 at 10:18-10:30, 11:38-50, 12:27-12:12:33.)

Miller moves to suppress all pre-*Miranda* statements made to law enforcement on February 5, 2019. (Dkt. 114 at 8-11.) Specifically, Miller moves to suppress pre-*Miranda* statements made in Officer Chouinard's squad car and at the Jail. (*Id.*) Though unclear, it appears Miller also moves to suppress the post-*Miranda* statements he made at the Jail. (Dkt. 97.) Miller also moves to suppress all evidence seized as a result of the

officers' warrantless search, specifically the handgun found during the traffic stop.  (Dkt. 54 at 4-7.)  The Court addresses each motion below.

## II.    DISCUSSION

### A.    Motion to Suppress Statements

Miller moves to suppress three categories of pre-*Miranda* statements: (1) statements made while alone in Officer Chouinard's squad car immediately after he was arrested and placed in the back seat; (2) statements made in Officer Chouinard's squad car while being transported to the Jail; and (3) pre-*Miranda* statements made to Sergeant Moore at the Jail.  (Dkt. 114 at 9.)  Miller also moves to suppress the post-*Miranda* statements he made at the Jail.  (Dkt. 97.)

Pursuant to *Miranda v. Arizona*, an individual must be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  384 U.S. 436, 444 (1966).  Accordingly, the protections afforded by *Miranda* are triggered when an individual "'is both in custody **and** being interrogated.'"  *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (quoting *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995)) (emphasis added); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994).  The law in the Eighth Circuit is that non-*Mirandized* "[s]tatements that are the product of a non-custodial interrogation may also be suppressed if the statements are not made voluntarily."  *United States v. Clark*, No. 15-cr-154 DWF/LIB, 2015 WL 4964665, at *3 (D. Minn. Aug. 19, 2015) (citing *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005) (considering the voluntary nature of a statement that was the product of

noncustodial questioning)).  As such, the Court will proceed with analyzing: (1) whether each statement category amounted to a custodial interrogation that would have required officers to provide Miller with his *Miranda* rights before interviewing him; and (2) if the interview was not a custodial interrogation requiring *Miranda* rights, whether the statements were made voluntarily.

"The 'ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014) (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)) (citation omitted).  "The custody inquiry thus turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty . . .  to terminate the interrogation and cause the agent to leave."  *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (internal citation omitted).  "We do not ask how [the defendant] perceived the situation; . . . the point is how a reasonable person would have seen his options in the circumstances."  *United States v. Perrin*, 659 F.3d 718, 719 (8th Cir. 2011) (citation omitted); *see also United States v. Wolk*, 337 F.3d 997, 1006 (8th Cir. 2003) ("'[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'") (alteration in original) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).

When ascertaining whether a suspect is in custody, courts in many instances cite to and consider the following non-exhaustive six "indicia of custody" articulated in *Griffin*:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during the questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated; and

(6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011) (citing *Griffin*, 922 F.2d at 1349); *see also United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016). However, "[i]t is not necessary to a finding of custody that all of the foregoing indicia be presented by the factual circumstances of a case . . . ." *Griffin*, 922 F.2d at 1349. "'[A] particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors.'" *Thomas*, 664 F.3d at 222 (citation omitted). The *Griffin* factors "are not by any means exclusive, and . . . 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Czichray*, 378 F.3d at 827; *see also Perrin*, 659 F.3d at 720 (cautioning that the factors in *Griffin* are "simply a rubric for considering the ultimate issue, not a mandatory checklist"). In this case, the parties do not dispute—and the Court concludes—that Miller was "in custody" when he made all three categories of pre-*Miranda* statements. (*See* Dkt. 114 at 9 ("It is undisputed that, starting from the time Mr. Miller was arrested

and placed in the back of the squad car, he was 'in custody' for Fifth Amendment purposes."); *see also* Dkt. 116 at 8 ("Miller was unquestionably in law enforcement custody when he made all three types of pre-*Miranda* statements[.]").)

With respect to voluntariness of statements, the Eighth Circuit has concluded:

A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.  We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.

*Brave Heart*, 397 F.3d at 1040 (marks and citations omitted); *see also Clark*, 2015 WL 4964665, at *5.  The Government must prove by a preponderance of the evidence that the defendant's statements were voluntary.  *See Brave Heart*, 397 F.3d at 1040 (citation omitted).

## 1.    Pre-*Miranda* statements made while alone in Officer Chouinard's squad car

The first category of pre-*Miranda* statements consists of those Miller made while alone in Officer Chouinard's squad car immediately after he was arrested and placed in the back seat.  (*See generally* Gov't Ex. 2.)  Miller argues that the statements he made while alone in Officer Chouinard's squad car should be suppressed because the police elicited an incriminating response from him.  (Dkt. 114 at 9-10.)  According to Miller, the *Miranda* safeguards outlined by the Supreme Court in *Rhode Island v. Innis* apply to this case, and the officers' actions of searching the SUV and arresting KMJ were "reasonably likely" to cause Miller to make such statements.  (Dkt. 114 at 9 (citing *Rhode Island v.*

*Innis*, 446 U.S. 291, 300-02 (1980)).) Miller also contends that he did not know he was being recorded and that he was talking to himself, not making voluntary statements to law enforcement. (*Id.*) The Government counters that officers "merely conduct[ed] a routine traffic stop and transported a suspect to jail" and that Miller's statements were spontaneous. (Dkt. 116 at 9.) In reply, Miller maintains that the officers elicited a response from him and that his statements were not spontaneous or voluntary. (Dkt. 122 at 6-7.)

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 301-02. In *Innis*, the Supreme Court defined "the term 'interrogation' under *Miranda*" to refer "not only" to (1) "express questioning," but also to (2) "any words or actions on the part of the police (**other than those normally attendant to arrest and custody**) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301 (footnotes omitted) (emphasis added). "*Miranda* does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996)).

The statements at issue are: "Damn, my fingerprints are all over that bitch!" and "Bae, don't say shit! Don't say shit! It ain't yours! Don't say shit! Bitch! Fuck them! Bitches! Don't say shit. Fuck them. Let them do they job." (Gov't Ex. 2. at 2:56:56-2:57:00, 2:57:55-2:58:25.) Because the Government concedes that Miller was "in custody" (Dkt. 116 at 8) when those statements were made and that he had not been

14

*Mirandized* until he got to the Jail (Dkt. 133 at 65), the issue is whether there was an

interrogation or its "functional equivalent" at the time these statements were made.

While the video footage shows Miller was clearly not subject to "express

questioning" by law enforcement when alone in the squad car, an interrogation, for

purposes of *Miranda*, may also refer to words or conduct that the officer should know are

"reasonably likely to illicit an incriminating response from the suspect." *Innis*, 446 U.S.

at 301 (footnote omitted).  However, there is nothing in the record showing that officers

should have known their actions, searching the SUV and arresting KMJ, were reasonably

likely to elicit an incriminating response from Miller.  Indeed, this conduct is more in line

with conduct that is "normally attendant to arrest and custody" that is expressly excluded

as a "functional equivalent" of express questioning. *See Innis*, 446 U.S. at 301.  Miller

contends that the search was illegal and his arrest was wrongful and thus the officers'

conduct was not "normally attendant to arrest and custody."  (Dkt. 122 at 7.)  Even if the

legality of the search and arrest were relevant, as discussed in Section II.B, the Court

finds that there was no illegal search, and in view of the evidence that Miller was arrested

for violating the DANCO (Dkt. 113 at 31), there is nothing to suggest his arrest was

wrongful.  Moreover, the Eighth Circuit has held that leaving suspects alone in a squad

car with a recording device activated is not the functional equivalent of express

questioning. *See United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir.), *as

amended* (July 7, 2010), *opinion amended on denial of reh'g*, 611 F.3d 418 (8th Cir.

2010).  Accordingly, Miller's Motion to Suppress Statements should be denied to the

extent it seeks to suppress statements that Miller made while alone in Officer

Chouinard's squad car immediately after he was arrested and placed in the back seat.

> ###        2.        Pre-*Miranda* statements made in Officer Chouinard's squad car while being transported to the Jail

The second category consists of pre-*Miranda* statements Miller made in Officer

Chouinard's squad car while being transported to the Jail.  (*See generally* Gov't Ex. 2.)

Miller asks the Court to suppress all pre-*Miranda* statements made in Officer

Chouinard's squad car while being transported to the Jail.  (Dkt. 114 at 9-11; *see* Gov't

Ex. 2.)  In response, the Government argues that Miller's "unprompted" statements to

Officer Chouinard during his transport were not made in response to any inquiry from

law enforcement.  (Dkt. 116 at 8.)  For clarity, the second category is divided into two

sub-categories.  The first sub-category of statements involves a conversation between

Officer Chouinard and Miller about his allegedly missing money as well as Miller's

statements that the police should let KMJ go because the handgun was his.  (Gov't Ex. 2

at 2:59:08-3:00:50 ("the first sub-category").)  The second sub-category involves an

exchange between Officer Chouinard and Miller that took place after Officer Chouinard

questioned Miller's assertion that the handgun belonged to Miller by responding, "She

said it was her gun, dude."  (*Id.* at 3:00:50 ("the second sub-category").)

The first sub-category includes statements made by Miller during a conversation

with Officer Chouinard about money allegedly missing from Miller's pocket (Gov't Ex. 2

at 2:59:08-2:59:47), Miller's question (after about 15 seconds of silence) asking what put

the police onto KMJ's car (*id.* at 3:00:02-3:00:20), and Miller's statement (after about 25

seconds of silence) that, "You all need to let her go man . . . that's my gun" and then,

"You all need to let her go.  That's my gun." in response to Officer Chouinard's "I'm

sorry, what?"  (*Id.* at 3:00:43-3:00:50.)  It is apparent from the video footage that these

statements, including Miller's question about KMJ's car and stating that the handgun was

his—both made after a period of silence—were voluntary and "spontaneous statement[s]

made during a conversation not initiated by the officer."  *See Chipps*, 410 F.3d at 445.

As to Miller's response of "You all need to let her go.  That's my gun." after Officer

Chouinard said, "I'm sorry, what?", the Eighth Circuit has held that "[a]n officer's

request for clarification of a spontaneous statement generally does not constitute

interrogation."  *Id.*  "We have repeatedly held that a voluntary statement made by a

suspect, not in response to interrogation, is not barred by the Fifth Amendment and is

admissible with or without the giving of *Miranda* warnings."  *United States v. Withorn*,

204 F.3d 790, 796 (8th Cir. 2000) (quoting *United States v. Hatten*, 68 F.3d 257, 262 (8th

Cir. 1995)).  Accordingly, Miller's Motion to Suppress Statements should be denied to

the extent it seeks to suppress statements from the first sub-category.

The second sub-category involves an exchange between Officer Chouinard and

Miller that took place after Miller said the handgun was his and Officer Chouinard told

Miller, "She said it was her gun, dude."  (*Id.* at 3:00:50 ("the second sub-category").)

This includes statements Miller makes in response to Officer Chouinard's statement,

"She said it was hers.  Whose DNA is going to be on it?"  (*Id.* at 3:01:02-3:01:17.)  At

the February 21 hearing, the Government represented that it did not intend to use footage

from Government Exhibit No. 2 "after that 3:01:01 point when the officer kind of starts

17

getting into a dialogue with him about his statement about the gun." (Dkt. 113 at 69.) In its post-hearing brief, the Government, "without conced[ing] that Miller's responses to some of Officer Chouinard's inquiries during the jail transport are inadmissible," represents that it does not intend to use those statements as part of its case-in-chief at trial. (Dkt. 116 at 8 n.3.) In reply, Miller argues that the Government's position does not make Miller's motion moot and that this Court should still decide the constitutional issue. (Dkt. 114 at 11 n.5.)

The Government has not represented that it will not use the statements between 3:00:50 and 3:01:01 in its case-in-chief at trial. The Court therefore considers this time period. This time period includes Officer Chouinard's response, "She said it was her gun, dude" in a challenging tone when Miller asserted the gun was his, Miller's response that the gun was in fact his, Officer Chouinard's assertion, "Okay, but she said it was hers," and Miller's response (again) that the gun was his.[3] (Gov't Ex. 2 at 3:00:50-3:01:01.) Case law provides that statements of fact as to what has occurred on the scene of a criminal investigation are not the functional equivalent of express questioning. *See Chipps*, 410 F.3d at 445. "Whether a particular statement constitutes an interrogation depends upon the circumstances of each case, but we generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities." *United States v. Hull*, 419 F.3d 762, 767

---

[3] The Court notes that Officer Chouinard's assertion, "She said it was her gun, dude." is very similar to the "She said it was hers. Whose DNA is going to be on it?" that marks the portion of the recording that the Government has agreed not to use in its case-in-chief. (*Compare* Gov't Ex. 2 at 3:00:50-3:01:01, *with id.* at 3:01:02-3:01:17.)

(8th Cir. 2005).  A statement of fact by an officer is not a plea to the conscience of the defendant, and therefore absent coercive pressure, is not likely to elicit incriminating information.  *Chipps*, 410 F.3d at 445.  Here, in view of the fact that Miller was plainly concerned that KMJ was taking the blame for the handgun, Officer Chouinard's response to Miller's assertion that the gun was Miller's was a plea to Miller's conscience—not to let KMJ take the blame—and was intended to elicit an incriminating response—Miller's rejoinder that the gun was in fact his and not KMJ's.  The Court therefore recommends that Miller's motion to suppress be granted as to Miller's statements between 3:00:50 and 3:01:01 in Government Exhibit 2.

The Court considers the statements after 3:01:01 in Government Exhibit 2. Because the Government is not seeking to introduce statements after 3:01:01 in its case-in-chief, the Court recommends denial of Miller's motion to suppress these statements as moot.  *See, e.g.*, *United States v. Reyes*, No. CR 17-40 (RHK/FLN), 2017 WL 4047954, at *3 (D. Minn. July 31, 2017), *R.&R. adopted*, No. CR 17-40 (MJD/FLN), 2017 WL 4022408 (D. Minn. Sept. 12, 2017)).  If the Government changes its position with respect to Miller's statements after 3:01:01 such that it intends to use any of those statements during its case-in-chief, it shall notify the Court within five (5) days of doing so.

### 3.    Pre-*Miranda* statements made to Sergeant Moore at the Jail

The third category of statements are the pre-*Miranda* statements Miller made to Sergeant Moore at the Jail.  (*See generally* Gov't Ex. 3.)  Again, there is no dispute that Miller was "in custody" when speaking to Sergeant Moore at the Jail.

Miller argues the pre-*Miranda* statements should be suppressed because Sergeant Moore questioned him for several minutes before delivering a *Miranda* warning. (Dkt. 114 at 11.) In response, the Government argues that Miller initiated and pursued a discussion with Sergeant Moore in connection with a "completely unrelated" criminal matter, and that any pre-*Miranda* statements made were not in response to questioning by law enforcement. (Dkt. 116 at 10.) The Government also argues Sergeant Moore made several attempts to provide Miller with his *Miranda* warnings. (Dkt. 116 at 10.) In reply, Miller counters that Sergeant Moore could have interrupted Miller to read him his *Miranda* rights but failed to do so. (Dkt. 122 at 7-8.)

The Court has carefully considered Miller's pre-*Miranda* statements at the Jail. Other than asking Miller whether his information about the unrelated criminal matter was "first-hand information or word of mouth" and if Miller had given a buccal sample before, Sergeant Moore did not directly question Miller before reading him his *Miranda* rights. (*See generally* Gov't Ex. 3 at 0:00-8:17.) Rather, Sergeant Moore responded to most of Miller's pre-*Mirandized* statements with short, verbal responses like "ok" (*id.* at 1:40-1:45), "uh-huh" (*id.* 2:20-2:23), "sure" (*id.* at 2:40-2:42), and "I get it" (*id.* at 3:25-3:28). Thus, the Court focuses on whether Sergeant Moore's responses constitute the functional equivalent of express questioning. *See Innis*, 446 U.S. at 301.

Here, Miller initiated the conversation in the holding cell by asking if he could tell Sergeant Moore something and then proceeded to talk about the unrelated criminal matter and asking to speak with KMJ. (*See* Gov't Ex. 3 at 0:44-5:02.) Though unsuccessful, Sergeant Moore made repeated attempts to shift Miller's attention to the interview and to

20

read Miller his *Miranda* rights.  (*Id.* at 5:06-5:21; 5:27-5:30; 6:30-6:35.)  However,

Miller kept offering to provide Sergeant Moore with information in connection to the

unrelated criminal incident.  (*Id.* at 2:27-3:10, 4:20-4:48, 5:50-6:24.)

 As previously discussed, "a mere factual statement . . . serv[ing] to inform the

suspect as to the status of his case or the investigation into his activities" does not

constitute interrogation, *Hull*, 419 F.3d at 767, nor does asking "for routine information

necessary for basic identification purposes," unless "the government agent should

reasonably be aware that the information sought . . . is directly relevant to the substantive

offense charged," *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012).  Further,

"[a]n officer's request for clarification of a spontaneous statement generally does not

constitute interrogation" unless it attempts to "'enhance [the suspect's] guilt." *Chipps*,

410 F.3d at 445 (quoting *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989)).  Based

on the Court's review of Government Exhibit 3, Sergeant Moore's responses to Miller's

statements and occasional questions are analogous to the type of "[p]olite conversation

[that] is not the functional equivalent of interrogation," *United States v. Tail*, 459 F.3d

854, 858 (8th Cir. 2006), particularly when there is no suggestion that Sergeant Moore

tried to steer the pre-*Miranda* conversation toward potentially incriminating topics, *see*

*id.*  Further, Sergeant Moore's brief statements and occasional clarifying questions were

in response to Miller's voluntary statements about the other criminal matter and did not

bring up unrelated facts with respect to the instant charge that Miller did not mention, *see*

*United States v. Juan*, No. 19-CR-4032-LTS-KEM, 2019 WL 5077698, at *7 (N.D. Iowa

Sept. 9, 2019) (recommending denial of suppression motion except as to question about

21

suspect watching child pornography video and follow-up question about how many times), *R.&R. adopted*, No. 19-CR-4032-LTS-KEM, 2019 WL 5073190 (N.D. Iowa Oct. 9, 2019), nor did he ask Miller "specific, direct questions about his case before reading him his rights," *United States v. St. John*, No. 8:19CR234, 2019 WL 8225932, at *7 (D. Neb. Dec. 20, 2019) (recommending denial of suppression motion), *R.&R. adopted*, No. 8:19-CR-234, 2020 WL 1248576 (D. Neb. Mar. 16, 2020).

Moreover, Sergeant Moore was trying to read Miller his *Miranda* rights when Miller interrupted with the statement that he had bought the handgun and that his DNA would be on it. In particular, after Miller responded that his information about the other crime was not first-hand, Sergeant Moore said "Let me get to this real quick and then – I got to do this quick cause – while you're down here – and then we'll talk, all right? And here's the deal. I can send somebody down there – here – that can talk to you." (*Id.* at 5:03-5:22.) Miller said, "OK, what do I got to do? What are we doing now?" (*Id.* at 5:23-5:27.) Sergeant Moore responded, "I just have to – have to read you *Miranda*, read you your rights, OK, and then I'm going to ask you for a buccal sample." (*Id.* at 5:27-5:34.) Miller said, "Uh huh," and Sergeant Moore asked, "Have you done that before?" (*Id.* at 5:34-37.) Miller responded, "Yeah, I did," Sergeant Moore said, "OK. And then I'm going to just – " when Miller interrupted with "Hey, I'm letting you know now, it's going to come in with my DNA on it. I just bought that motherfucker. But it's going to come back with my DNA on it. [Indistinguishable.] You feel me?" (*Id.* at 5:37-5:50.) Sergeant Moore said, "OK, yeah I hear you." (*Id.* at 5:50-5:51.) Sergeant Moore's attempt to read Miller his *Miranda* rights and make sure Miller understood what a buccal

sample was do not constitute words or actions likely to elicit an incriminating response from Miller. Moreover, Sergeant Moore was not obligated to interrupt Miller's volunteered statements to administer the *Miranda* warning. *See Tolliver v. Sheets*, 594 F.3d 900, 920 (6th Cir. 2010) ("Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning.").

Miller has not identified any statement made by Sergeant Moore before he was given the *Miranda* warning that constituted the functional equivalent of express questioning. Indeed, even after his admissions that his DNA would be on the gun and he bought the gun, Miller returned to the topic of providing information regarding the other criminal matter and asking to see KMJ before Sergeant Moore administered the *Miranda* warning.

For these reasons, the Court recommends denying Miller's Motion to Suppress Statements to the extent it seeks to suppress the pre-*Miranda* statements made to Sergeant Moore at the Jail.

### 4.    Post-*Miranda* statements made to Sergeant Moore at the Jail

As previously mentioned, it is unclear whether Miller is moving to suppress his post-*Miranda* statements made to Sergeant Moore at the Jail. (Dkt. 97; Gov't Ex. 3.) In an abundance of caution, the Court addresses these post-*Miranda* statements. Miller presents no arguments regarding his post-*Miranda* statements made at the Jail in any of his briefing. (*See generally* Dkts. 114, 122.) The Government argues that Miller's post-

Miranda confession was voluntary and knowing. (Dkt. 116 at 11.) As explained below, the Court agrees.

Eight minutes into the audio recording, Sergeant Moore read Miller his *Miranda* rights. (*Id.* at 8:17-8:55; Dkt. 133 at 65.) Miller orally confirmed his understanding of his rights and initialed and signed the *Miranda* form. (Gov't Ex. 3 at 8:17-9:03; Dkt. 133 at 52-53; Gov't Ex. 4.) Afterward, Miller confessed to placing the recovered handgun in the console of KMJ's SUV at some point before the traffic stop. (Gov't Ex. 3 at 10:18-10:30; 11:37-11:45.) Miller never asked officers to stop questioning him, never asked for an attorney, or never invoked his right to remain silent. Under the totality of the circumstances, the audio recording does not show that Miller's statement was taken by force, threat, violence, or express or implied promises of any kind or that Miller's "will has been overborne" by any conduct of law enforcement. *See Brave Heart*, 397 F.3d at 1040 (marks and citations omitted). The Court concludes that Miller made a knowing and voluntary waiver of his *Miranda* rights and that his confession was voluntary and knowing. Accordingly, the Court recommends denying Miller's Motion to Suppress Statements to the extent it seeks to suppress the post-*Miranda* statements made to Sergeant Moore at the Jail.

**B.    Motion to Suppress Evidence Obtained Through Search and Seizure**

In support of his motion to suppress the evidence arising out of the search and seizure, Miller argues that "law enforcement lacked reasonable articulable suspicion or probable cause to seize the defendant by initiating a traffic stop, and that the warrantless search of the car and seizure of the handgun violated his [Fourth Amendment] rights."

24

(Dkt. 101 at 1-2.) The Government argues that there was no search and that the handgun was recovered under plain view while conducting a valid traffic stop based on Miller's violation of the DANCO and the fact that KMJ was driving with a revoked license. (Dkt. 116 at 6.) In the alternative, the Government argues that if officers had been conducting a search when the handgun was discovered, the search was lawful under the protective sweep exception. (*Id.* at 6-7.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The basic purpose of the Fourth Amendment, "'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

The Court considers Miller's arguments in turn below.

## 1.    Traffic stop

It is unclear whether Miller still claims the traffic stop lacked reasonable articulable suspicion or probable cause. In his post-hearing brief, Miller acknowledges the Government's testimony that there was a DANCO in place and that KMJ's license was revoked and that this formed the basis for the traffic stop. (Dkt. 114 at 1-2.)

25

Although he argues that KMJ was not informed of the license revocation when the SUV was pulled over, there is no evidence suggesting her license was not revoked.  In any event, law enforcement confirmed that the DANCO was still in place and then decided to arrest Miller for violating the DANCO because they observed he was in contact with KMJ.  This provides sufficient basis for the traffic stop.

### 2.    Protective sweep exception

The Court next considers whether the protective sweep exception applies.  The Government argues that even if the officers' conduct amounted to a "search" when Officer Maloney observed the firearm, the search was lawful under the protective sweep exception to the warrant requirement.  (Dkt. 116 at 6-7.)  The Government contends that when Officer Maloney performed a protective sweep of the area where Miller had been sitting while in felony violation of DANCO, KMJ was still within reaching distance of the passenger area of the SUV.  (*Id.* at 7.)  Miller argues there was no longer a concern for officer safety when officers searched the vehicle because he was already in police custody.  (Dkt. 122 at 3.)

It is well established that law enforcement may conduct a protective search for weapons in the absence of a warrant if he or she has merely an articulable suspicion a suspect is armed and dangerous.  *Terry v. Ohio*, 392 U.S. 1, 24 (1968).  The general principles set forth in *Terry* have been extended to include vehicle searches.  *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983).  In *Long*, the Supreme Court stated:

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts

26

which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* (quoting *Terry*, 392 U.S. at 21). "At any investigative stop . . . officers may take steps reasonably necessary to protect their personal safety." *United States v. Shranklen*, 315 F.3d 959, 961 (8th Cir. 2003).

"After securing a suspect, officers may also conduct a protective sweep of the vehicle's passenger compartment to search for dangerous weapons that the suspect **or other occupants** might later access." *United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011) (emphasis added); *see also United States v. Plummer*, 409 F.3d 906, 908-09 (8th Cir. 2005). In determining whether an officer's conduct met the Fourth Amendment's standard of reasonableness, "the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger." *Smith*, 645 F.3d at 1003. A valid "search for the purposes of officer safety extends to closed containers, such as a pouch, that is found within the vehicle's passenger compartment." *Shranklen*, 315 F.3d 963 (cleaned up). "[A]n officer may search a container found in a vehicle when that container might hold a weapon." *Id.*

The circumstances present in this case are sufficient to create an objectively reasonable concern for officer safety or suspicion of danger. First, officers knew that Miller was charged in connection with the November 2018 shooting and knew that he was a felon prohibited from possessing a firearm. (Dkt. 113 at 28, 32.) They also knew he was violating a DANCO. (*Id.* at 31.) Although Miller had already been removed from the SUV and placed into police custody when the search was conducted (Gov't Ex.

1 at 1:40-2:00), officer safety was still a valid concern because KMJ, the driver of the SUV and Miller's girlfriend, was not in police custody while speaking to Sergeant Dunaski and in fact exited and then re-entered the SUV to search for something in the console. *See United States v. Salamasina*, 615 F.3d 925, 930 (8th Cir. 2010) (reasoning officer safety justified search of vehicle where unsecured passengers may gain access to weapons or destroy evidence); *United States v. Ray*, No. 8:13CR135, 2013 WL 4407484, at *7 (D. Neb. Aug. 8, 2013) ("The officers permissibly searched the passenger compartment of the vehicle believing Ms. Bass or one of the residence's occupants might gain immediate control of a weapon from the vehicle. Accordingly, the fact that the driver had been removed from the vehicle and handcuffed did not eliminate the necessity of the search.") (citations omitted). The Court concludes that law enforcement was justified in conducting a protective sweep of the passenger compartment of the SUV, which could include the inside of the center console and bags in which a weapon could be hidden. The Court therefore recommends denial of Defendant's Motion to Suppress Evidence Obtained Through Search and Seizure to the extent it is based on the argument that the search was unlawful.

### 3.    Plain view doctrine

The Government also contends that the events that took place after the traffic stop do not amount to a search but rather a plain view discovery of the handgun because Officer Maloney, while conducting a valid traffic stop, observed the handgun in plain sight as KMJ looked through the center console of the SUV. (Dkt. 116 at 6.) Miller argues that the plain view exception does not apply because Officer Maloney had no prior

28

justification for searching the vehicle "when the gun was discovered." (Dkt. 114 at 7;

Dkt. 122 at 3.) Miller argues that the search that took place after he was taken into

custody but before KMJ accessed the center console was an illegal, warrantless search.

(Dkt. 122 at 2 (citing Gov't Ex. 1. at 1:45-3:45).)

"It is well established that under certain circumstances the police may seize

evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443,

465 (1971); *see also Horton v. California*, 496 U.S. 128, 130 (1990) (finding the

inadvertent discovery of evidence is not required to justify plain view seizure). "An

object may be seized by the police without a warrant under the plain view doctrine if '(1)

the officer did not violate the Fourth Amendment in arriving at the place from which the

evidence could be plainly viewed, (2) the object's incriminating character is immediately

apparent, and (3) the officer has a lawful right of access to the object itself.'" *United

States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015) (quoting *United States v. Collins*,

321 F.3d 691, 694 (8th Cir. 2003)); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375

(1993) (holding that police may seize an object without a warrant if they "are lawfully in

a position from which they view [the] object, if its incriminating character is immediately

apparent, and if the officers have a lawful right of access to the object").

Miller argues the plain view doctrine does not apply "because Officer Maloney did

not have a prior justification for searching inside the vehicle when the gun was

discovered." (Dkt. 114 at 7.) The Court rejects this argument because, as discussed in

Section II.B.2, the Court concludes that the officers were entitled to conduct a protective

sweep of the SUV. *See United States v. Briddle*, 436 F.2d 4, 7 (8th Cir. 1970) (declining

to suppress shotgun discovered in plain view during protective sweep even if underlying search warrant was invalid); *United States v. Sherrod*, No. 4160032501CRWRK, 2017 WL 5987692, at *6 (W.D. Mo. Dec. 1, 2017) (denying motion to suppress under plain view doctrine where firearm was viewed during lawful protective sweep even though evidence from subsequent search was suppressed).

Further, even if the Court assumed the search of the SUV was unlawful, the plain view doctrine applies because the gun was not discovered as a result of that search. Rather, Officer Maloney, who was standing next to the open passenger door, saw the handgun when KMJ opened the center console and exposed the handgun while looking through various papers.  (Gov't Ex. 1 at 3:40-3:46.)  An officer must have "prior justification for [the] intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused."  *Horton,* 496 U.S. at 136.  Here, the police officers, including Officer Maloney, were lawfully near the SUV because the traffic stop was justified due to Miller's violation of the DANCO and because they knew KMJ had a revoked license.  The officers knew that Miller was prohibited from possessing a firearm, making the handgun's incriminating character immediately apparent.  (Dkt. 113 at 32.)  Further, Officer Maloney's discovery of the handgun when KMJ exposed it by rifling through papers in the center console was inadvertent.[4]  (*See id.* at 3:46-3:49.)  Regardless of the legality of the preceding search, there is no basis for suppressing the handgun when

---

[4]    Miller has not argued that it was unlawful for Officer Maloney to be standing in the open passenger door or for him to look inside the center console once KMJ opened it.

it was in plain view because KMJ opened the center console and not as a result of the

search challenged by Miller. Accordingly, the Court finds that the plain view doctrine

applies, and recommends denial of the Motion to Suppress Evidence on that ground.[5]

## C.     Bad Faith Argument

Miller contends that the fact that law enforcement "knew that Mr. Miller was

prohibited from possessing firearms, they were surveilling him that day as part of an

ongoing investigation into a November 2, 2018 shooting, for which Miller had been

charged in Ramsey County, and they thought he may in possession of evidence in that

case" is not "appropriate pretext" for stopping the SUV. This argument is foreclosed by

Supreme Court and Eighth Circuit precedent. *See, e.g.*, *Whren v. United States*, 517 U.S.

806, 813 (1996) (rejecting "argument that the constitutional reasonableness of traffic

stops depends on the actual motivations of the individual officers involved"); *United

States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) ("We have previously observed that

it is well established that a traffic violation—however minor—creates probable cause to

stop the driver of a vehicle. This is true even if a valid traffic stop is a pretext for other

investigation.") (cleaned up). Miller also argues that law enforcement had no basis for

---

[5]     In its pre-hearing brief, the Government argued that even if the handgun was
recovered during a search, Miller lacks standing to challenge the search because he does
not have a reasonable expectation of privacy in KMJ's SUV while he was subject to the
DANCO. (Dkt. 116 at 7.) Miller argues that the Government did not present the issue of
standing at the February 21 hearing, but nevertheless, Miller has a reasonable expectation
of privacy in KMJ's SUV. (Dkt. 122 at 5.) Miller seeks the opportunity to submit
evidence establishing his reasonable expectation of privacy in the SUV if this Court finds
standing is an issue. (*Id.*) Because the Court recommends denial of Defendant's Motion
to Suppress Evidence Obtained Through Search and Seizure on other grounds, the Court
does not reach this issue.

arresting KMJ and no reason to believe Miller was in possession of a firearm when the

SUV was pulled over.  (Dkt. 122 at 8-9.)  He contends that this conduct, in connection

with the warrantless search and questioning by Officer Chouinard and Sergeant Moore,

violated his constitutional rights with no excuse and should result in the exclusion of any

evidence arising therefrom.  The Court construes this as a "fruit of the poisonous tree"

argument.  *See Wong Sun v. United States*, 371 U.S. 471, 487 (1963).  As discussed in

Section II.A-B, the Court finds no violation of Miller's constitutional rights, and

therefore recommends denial of Miller's motion to the extent it is based on this theory.

### III.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED**

**THAT:**

1.    Defendant's Motion to Suppress Statements (Dkt. 97) be **DENIED** except

as to Miller's statements made between 3:00:50 and 3:01:01 in Government Exhibit 2;

and

2.    Defendant's Motion to Suppress Evidence Obtained Through Search and

Seizure (Dkt. 101) be **DENIED**.

DATED: May 19, 2020                    *s/Elizabeth Cowan Wright*
                                       ELIZABETH COWAN WRIGHT
                                       United States Magistrate Judge

## **NOTICE**

Filing Objections: This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).